IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Laura Putman, ) | Civil Action No. 6:13-925-MGL-KFM |
|         Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
|     vs. ) | |
| ) | |
| Carolyn W. Colvin, ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
|         Defendant. ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. § 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits ("DIB") on October 16, 2009, alleging that she became unable to work on May 29, 2009. The application was denied initially and on reconsideration by the Social Security Administration. On February 11, 2011, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and G. Roy Sumpter, an impartial vocational expert,

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

appeared on October 27, 2011, considered the case *de novo* and, on January 6, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on February 6, 2013.  The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.
>
> (2)    The claimant has not engaged in substantial gainful activity since May 29, 2009, the alleged onset date (20 C.F.R §§ 404.1571 *et seq*).
>
> (3)    The claimant has the following severe impairments: depression, anxiety, hypertension, and diabetes mellitus with neuropathy (20 C.F.R. § 404.1520(c)).
>
> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).
>
> (5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b).  Specifically, I find that she can lift 20 pounds occasionally and 10 pounds frequently.  I also find that she can sit, stand or walk for up to 6-hours in an 8-hour day, respectively, with the ability to change positions and not stand constantly.  I further find that she can never use a ladder, but can occasionally climb.  She can frequently balance, kneel, crouch and crawl.  Additionally, I find that she should avoid concentrated exposure to hazards. Finally, I find that she is limited to unskilled work with no more than occasional interaction with the public.
>
> (6)    The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

(7)    The claimant was born on September 15, 1965, and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. § 404.1563).

(8)    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

(9)    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569 and 404.1569(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from May 29, 2009, through the date of this decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits will be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

3

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by

4

substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a  verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff graduated from high school and attended one year of college (Tr. 57).  She spent 20 years as an administrative assistant with the Greenville Hospital System (Tr. 137). The plaintiff then worked two other administrative assistant jobs (Tr. 59-61).  After her last job ended in May 2009, and during the period of alleged disability, the plaintiff collected unemployment benefits for at least two years and continued applying for other jobs (Tr. 55-59).

The plaintiff visited Dr. James Bloodworth, a primary care physician, in November and December 2008 and January and February 2009.  She complained of congestion a few times and visited for diabetes follow-ups (Tr. 206-12).

The plaintiff has seen Dr. Mario Galvarino, a psychiatrist, since October 2008. On November 18, 2008, the plaintiff reported feeling depressed and sad.  Her medications were refilled, and she was advised to see a therapist (Tr. 233-34). In late 2008 and the first

5

half of 2009, the plaintiff visited every few months for follow-ups (Tr. 230-234).  She sometimes presented with a sad mood, but often her "thinking [was] clear" (Tr. 230-32).

In June 2009, the plaintiff visited Dr. Bloodworth complaining of elevated blood sugar, and the exam was otherwise normal (Tr. 204).  On June 10, 2009, she was reevaluated by Dr. Galvarino, whom she told that she was having a problem with a supervisor at work.  It was noted that she was eventually fired.  He noted she was "very verbal" and "appears perplexed," but that "her thinking is clear." Dr. Galvarino assigned a Global Assessment of Functioning ("GAF")[3] score of 64, indicating mild symptoms or limitations (Tr. 229).

In a July 2009 visit, Dr. Galvarino noted the plaintiff's affect was appropriate and that "pt. is very busy …." In August 2009, he again noted the plaintiff was "busy with the children and children school activities" but had a flat affect. He assigned a GAF score of 64, indicating mild problems (Tr. 227-28).

On August 26, 2009, the plaintiff returned to Dr. Bloodworth complaining of continued elevated blood sugar (Tr. 202).  Dr. Bloodworth noted the plaintiff had chronic stress and depression, but that she reported "doing well" on Effexor and Wellbutrin (Tr. 201).  The plaintiff also reported that she had recently retired and had not been walking regularly as she did while working (Tr. 201).  The clinical exam revealed a "normal mood and appropriate affect," and Dr. Bloodworth advised the plaintiff to exercise (Tr. 202).

In September 2009, the plaintiff returned for a diabetes follow-up. She denied any walking pain or numbness (Tr. 198).  The plaintiff's hypertension was listed as "moderately well" controlled. She again reported she had recently "retired," and clinical exam was entirely normal (Tr. 198-200).

---

[3]A GAF score os a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning."   Diagnostic and Statistical Manual of Mental Disorders, Fourth Ed., Text Revision, p. 32 (2000) (DSM-IV-TR).  A score between 61 and 70 denotes "mild" functional limitations or symptoms. Id. at p. 34.

6

In September 2009, Dr. Galvarino noted "pt. is pleasant," her "thinking is clear," and "affect is appropriate" (Tr. 226). He assigned a GAF of 66 (Tr. 226). In October 2009, Dr. Galvarino noted that the plaintiff "functions well—she cooks, cleans— she has quit working" (Tr. 225). He noted the plaintiff had a flat affect and sad mood that day, and assigned a GAF of 67 (Tr. 225). The plaintiff returned to Dr. Galvarino in November and December 2009, complaining of stress, fatigue, and a relationship difficulty with her husband (Tr. 224, 335).

On December 11, 2009, the plaintiff was treated in the emergency room at St. Francis Hospital after having possible seizure activity and a rapid heart rate. She had experienced a brief loss of consciousness with "jerking all over." The plaintiff reported headaches as well (Tr. 236-58).

On December 15, 2009, the plaintiff saw Dr. Bloodworth for a follow-up for her loss of consciousness episode. She also complained of anxiety. She told Dr. Bloodworth she was seeing a therapist or counselor and a psychologist. Physical exam was normal, with normal gait and "no obvious motor or sensory deficits." Dr. Bloodworth noted that the plaintiff's diabetes was not controlled, reviewed her medications, ordered testing, and referred her to a cardiologist (Tr. 275-77).

On December 16, 2009, Francis Thandroyen, M.D., performed a cardiology consultation following the plaintiff's recent seizure-like episode. Dr. Thandroyen noted that the plaintiff had stopped regular exercise several months before but had gone to the gym with her husband prior to her episode. The plaintiff reported only being able to walk on an elliptical machine for 15 minutes before becoming tired. Dr. Thandroyen indicated that the plaintiff had multiple risk factors for coronary artery disease. He indicated that she had an abnormal EKG with left bundle branch block that was new in onset. Dr. Thandroyen ordered various tests and stated that the plaintiff's medications for anxiety and depression may have "played a role" in the symptoms she had experienced (Tr. 264-65).

7

On December 22, 2009, the plaintiff returned to Dr. Bloodworth. He reviewed records from her recent testing. Dr. Bloodworth stopped Zocor and referred the plaintiff for a neurology consultation (Tr. 272-74).

The plaintiff saw neurologist D. Courson Cunningham, M.D., on January 12, 2010. After her examination, Dr. Cunningham stated that the plaintiff's symptoms were most suggestive of a "synodal seizure." He ordered an EEG, which was normal "except for the presence of prominent beta activity usually related to medications, particularly benzodiazepines." He recommended the plaintiff be taken off Wellbutrin (Tr. 287-90).

Also on January 12, 2010, Dr. Galvarino noted that the plaintiff had found a friend but was having problems with her husband. She had "severe sadness" and was "very tired." Dr. Galvarino reviewed and continued the plaintiff's medications ad assessed a GAF of 70 (Tr. 334).

In February 2010, the plaintiff visited Dr. Bloodworth complaining of blood sugar difficulties (Tr. 322). Clinical exam was normal, and Dr. Bloodworth noted the plaintiff had a "normal mood and appropriate affect." (Tr. 323). A week later, the plaintiff returned for another follow-up, and Dr. Bloodworth again noted that she had a "normal mood and appropriate affect" (Tr. 320).

On February 16, 2010, Dr. Galvarino evaluated the plaintiff for continued sleep problems. Her mood was sad, and he continued her medications. He assessed a GAF of 70 (Tr. 333).

On April 23, 2010, Dr. Bloodworth evaluated the plaintiff for elevated blood sugars. The plaintiff reported that she "feels well." Dr. Bloodworth diagnosed uncontrolled diabetes mellitus type 1 and stable myositis. He prescribed Ativan, Diflucan, and Soma. (Tr. 316-18).

In a May 2010 visit, Dr. Bloodworth noted the plaintiff "wants to get off her medications. She will discuss this with [Dr. Galvarino]" (Tr. 314). The plaintiff reported that

8

her glucose levels fluctuated despite her medication, compliance with diet, and glucose monitoring.  Dr. Bloodworth prescribed Levemir Flexpen and advised consultation with an endocrinologist (Tr. 314-15).

On the plaintiff saw Dr. Galvarino again on June 1, 2010, and he adjusted and refilled her medications.  He assessed a GAF of 68 (Tr. 331).  In August 2010, the plaintiff reported stress around the anniversary of her deceased child but that she did "go to the beach and have a good time" (Tr. 339).  In August and September 2010, Dr. Galvarino assessed a GAF of 70 (Tr. 338-39).

In August 2010, the plaintiff was evaluated for increased anxiety and reported that she had gotten a ticket for driving with alcohol.  She told Dr. Bloodworth that her husband refused to pay the resulting increased insurance premiums and so she could not currently drive.  The situation had worsened her depression.  The plaintiff's blood sugars continued to fluctuate, and she "report[ed] that she feels well."  Dr. Bloodworth diagnosed uncontrolled diabetes and controlled hypertension (Tr. 375-77).

On November 17, 2010, Dr. Bloodworth described the plaintiff's depression as "stable with current meds" and that she was seeing Dr. Galvarino (Tr. 372).

On December 1, 2010, Dr. Galvarino indicated that the plaintiff's affect was flat, and her mood was sad.  He assessed a GAF of 69 (Tr. 396).  On March 2, 2011, Dr. Galvarino evaluated the plaintiff and indicated that her affect was flat, and she was still having problems with stress.  Dr. Galvarino continued to diagnose post traumatic stress syndrome ("PTSD") (Tr. 391).

In March 2011, the plaintiff reported doing housecleaning, and Dr. Galvarino noted she was "still not working" and was having problems with stress.  He continued to diagnose PTSD and refilled the plaintiff's medications (Tr. 391).

On April 5, 2011, Dr. Bloodworth evaluated the plaintiff's multiple medical conditions.  The plaintiff reported crying more but felt this was because it had been winter

9

time and that it would get better with the change of the season.  The plaintiff reported that despite compliance with medication and diet, her blood sugars had been running too high. Dr. Bloodworth noted that the plaintiff needed to see an endocrinologist.  The plaintiff complained of headaches "a few days before her cycle starts" and hypertension "aggravated by stress" (Tr. 369-71).

In June 2011, the plaintiff was seen by Dr. Galvarino and reported anxiety over her daughter moving out for college, her younger son in school, and her husband working, leaving her alone during the day (Tr. 388).  In August 2011, she again complained of anxiety, and Dr. Galvarino noted she had few friends to spend time with during the day (Tr. 381).

On August 15, 2011, Dr. Bloodworth evaluated the plaintiff for anxiety, noting that Dr. Galvarino had recently switched her to Cymbalta.  Dr. Bloodworth stated that the plaintiff's "blood sugars seemed to follow her stress level."  He indicated that the plaintiff's blood sugars had been "running high."  Dr. Bloodworth indicated that the plaintiff's diabetes and major depression were both "uncontrolled."  He reviewed and adjusted her medications (Tr. 366-68).

### *Medical Opinions*

On January 29, 2010, a Psychiatric Review Technique Questionnaire and a Mental Residual Functional Capacity ("RFC") form were completed by Xanthia Harkness, Ph.D., a non-examining doctor on contract to the Social Security Administration.  Dr. Harkness indicated that the plaintiff had medically determinable impairments causing mild restriction of daily activities; no difficulty in maintaining social functioning; moderate difficulty in maintaining concentration, persistence, and pace; and no episodes of decompensation. Dr. Harkness indicated that the plaintiff's symptoms were "credible" and that she continued to grieve the death of her child.  Dr. Harkness stated that the plaintiff's symptoms were

severe but did not prohibit her from performing "short, simple repetitive work away from the general public" (Tr. 296-309, 310-13).

On December 10, 2010, a Physical RFC Assessment was completed by Seham El-Ibiary, M.D., a non-examining doctor on contract to the Administration.  He found the plaintiff capable of lifting and carrying 50 pounds occasionally and 25 pounds frequently, standing/walking about six hours in an eight-hour workday, and sitting about six hours in an eight-hour workday.  Dr. El-Ibiary limited the plaintiff to never climbing ladders, ropes, or scaffolds; to occasionally balancing and climbs ramps and stairs; and to frequently performing all other postural abilities.  He indicated that the plaintiff would need to avoid even moderate exposure to hazards. He also indicated that the plaintiff's allegations were "generally credible" (Tr. 340-47).

On December 14, 2010, a Psychiatric Review Technique Questionnaire and a Mental RFC form were completed by Craig Horn, Ph.D.,  a non-examining doctor on contract to the Administration.   Dr. Horn indicated that the plaintiff had medically determinable impairments causing mild restriction of daily activities; mild difficulty in maintaining social functioning; moderate difficulty in maintaining concentration, persistence, and pace; and no episodes of decompensation. Dr. Horn indicated that was capable of performing "simple routine tasks" (Tr. 348-61, 362-65).

On October 19, 2011, Dr. Galvarino completed a Mental Impairment Questionnaire regarding the plaintiff.  Dr. Galvarino stated that he evaluates the plaintiff every two to three months for PTSD. He indicated that the plaintiff's current GAF score was 62, and her response to treatment had been poor.  The plaintiff's medications included Wellbutrin, Seroquel, Abilify, Cymbalta, Xanax, and Ambien.  Dr. Galvarino indicated that the plaintiff's clinical findings included severe depression, impulsive and erratic behavior, and isolates.  He stated that the plaintiff's prognosis was "poor." The plaintiff's signs and symptoms included anhedonia or pervasive loss of interest in almost all activities; appetite

disturbance; decreased energy; thoughts of suicide; blunt, flat, or inappropriate affect; feelings of guilt or worthlessness; impairment in impulse control; generalized persistent anxiety; difficulty thinking or concentration; recurrent or intrusive recollections of a traumatic experience, which are a source of marked distress; psychomotor retardation or agitation; changes in personality; paranoid thinking or inappropriate suspiciousness; seclusiveness or autistic thinking; emotional withdrawal or isolation; intense and unstable interpersonal relationships; motor tension; emotional instability; vigilance and scanning; memory impairment; and, sleep disturbance.  Dr. Galvarino indicated that the plaintiff was "unable to meet competitive standards" in almost all of the abilities and aptitudes needed to do unskilled work.  The plaintiff was "seriously limited but not precluded" in her ability to ask simple questions or request assistance, adhere to basic standards of neatness and cleanliness, and use public transportation.  Dr. Galvarino indicated that the plaintiff had "marked" restriction of activities of daily living; "marked" difficulties in maintaining social functioning; "marked" difficulties in maintaining concentration, persistence, or pace; and "three" episodes of decompensation.  Dr. Galvarino explained that the plaintiff had a medically documented history of "a chronic organic mental, schizophrenic, etc., or affective disorder of at least two years duration that has caused more than a minimal limitation of ability to do any basic work activity, with signs and symptoms currently attenuated by medication or psychological support" along with "three or more episodes of decompensation within 12 months, each at least 2 weeks long" and "a disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause the individual to decompensate."  Dr. Galvarino also indicated that the plaintiff had "an anxiety related disorder and complete inability to function independently outside of one's home."  Dr. Galvarino estimated that if the plaintiff attempted to work her impairments or treatment would cause her to be absent from work "more than 4 days per month."  He stated that her impairments lasted or could be expected

to last at least 12 months.  Dr. Galvarino stated that the plaintiff was not a malingerer and that her impairments were reasonably consistent with the symptoms and functional limitations he described.  Dr. Galvarino indicated that alcohol or substance abuse were not related to the plaintiff's limitations and that she would be able to manage her own benefits in her own best interest. (Tr. 398-403).

Dr. Galvarino also stated that the plaintiff  would not be capable of full-time work even at a sedentary level.  He indicated that the plaintiff's restrictions had persisted since May 29, 2009, and were "most probably permanent."  Dr. Galvarino stated that the plaintiff's "prognosis is very poor." (Tr. 404).

After the ALJ's January 2012 decision, the plaintiff submitted a June 2012 statement from Dr. Bloodworth in which he opined that the plaintiff's mental impairments "most probably" precluded an eight-hour workday.  He added that the plaintiff had "significant" neuropathy that limited her walking and standing and difficulty with her blood sugar.  Dr. Bloodworth stated that the plaintiff's psychological problems, specifically her anxiety, was "an even more serious" problem than was obvious in many of his office visits.  Dr. Bloodworth indicated that he did not focus on this problem during his visits since the plaintiff was being treated by Dr. Galvarino for that problem.  Dr. Bloodworth explained that the plaintiff was frequently tearful to the point of him noting that she was not tearful on a particular visit in February, since this was "unusual for her."  Dr. Bloodworth indicated that the plaintiff's anxiety makes it "more difficult for her to control her blood sugar, because stress causes the adrenal glands to release cortisol, which causes blood sugar to rise, which makes her more anxious."  Dr. Bloodworth stated, "Considering the difficulty controlling her emotions that I have observed in my office, she is most probably not going to be able to attend work on an 8 hour basis without decompensating to the point that tasks are interrupted on a frequent basis" (Tr. 406).

13

### *Hearing testimony*

At the hearing in October 2011, the plaintiff testified that she lost an infant in 2005, and that was when her mental difficulties began (Tr. 62). She said she could not work due to lack of concentration, crying spells, diabetes, and anxiety (Tr. 61). She also said she had migraine headaches about once each month and a non-migraine headache once each week (Tr. 69). The plaintiff testified she could not do a sedentary job because of anxiety, concentration problems, flashbacks to the night her son died, tingling in her feet from diabetes, and crying spells (Tr. 68). The plaintiff has to give herself four shots a day and estimated that she could sit for 45 minutes to an hour before her feet started tingling (Tr. 71). However, the plaintiff did acknowledge she had worked for years with diabetes since her diagnosis in 2006 (Tr. 70). She estimated that she could stand for about 15 to 30 minutes and could walk for five or six blocks (Tr. 72). The plaintiff also acknowledged that she also worked for years with her mental impairments (Tr. 73).

Regarding daily activities, the plaintiff testified that every day she did light housework, watched television for six or seven hours, skimmed newspapers, received visiting friends and family, did light cooking with the microwave and made sandwiches and salads, cared for her own hygiene without help, and did laundry and dishes (Tr. 63, 65-67). She acknowledged she had a driver's license and said the last time she drove was a week before to take her son to Wal-Mart to make a birthday wish list (Tr. 67). The plaintiff also said that "the only place I go" was to her son's football games (Tr. 67).

The ALJ asked the plaintiff why she did not pursue mental health treatment prior to 2008 (Tr. 63). The plaintiff first said she did not have a job and so could not afford therapy (Tr. 63). However, the ALJ commented that the plaintiff worked through mid-2009 and that the alleged mental difficulties began in 2005, so the plaintiff had four years during which she could have afforded therapy. The plaintiff then said she did get therapy for a time, but could not remember the name of the practice (Tr. 63-64). The plaintiff began

14

seeing Dr. Galvarino in October 2008, and he recommended a therapist. She saw the therapist twice but did not have the money to continue (Tr. 64).

Regarding neuropathy, the plaintiff admitted that no doctor thought her neuropathy severe enough to prescribe any medication for it (Tr. 69). She said her mental health medications do help, but that she has lightheadedness and fatigue as side effects (Tr. 78).

### January 2010 Function Report

In her January 2010 Function Report, the plaintiff wrote that she went outside every day, but rarely drove, and went shopping in stores and online for Christmas and birthday presents (Tr. 146). She also wrote that she does normal household chores; checked her blood sugar four times each day; prepared meals; did laundry; mopped the floors; vacuumed; cared for her ten year-old son; helped him with "homework, bath, daily activities, school"; provided water and food for her pets; prepared meals for herself in accordance with her diabetic needs; watched television; volunteered in children's sports leagues; talked with family and friends on the phone every day; could walk a mile before needing to rest; could follow instructions "well"; got along fine with authority figures; and had never been fired for social difficulties (Tr. 143-49).

### Vocational Evidence

At the hearing on October 27, 2011, G. Roy Sumpter, a vocational expert, testified that the plaintiff had past relevant work as a billing clerk and a coding clerk (Tr. 81). The ALJ asked the vocational expert if there would be any past work or other work available for a hypothetical person who retained the capacity of "medium work" with the following limitations:

> Since there is neuropathy in her feet, I'm going to put never a
> ladder and only occasional climbing. And it could affect her
> balance, so I'm going to put – I'm going go ahead and [put]
> frequent on the other posturals including balance – but the

15

> neuropathy in the feet could cause some balance issues – and then the kneeling, crouching, crawling. Avoid concentrated exposure to hazards. Because of her issues with – psychological issues and inability to concentrate, I'm going to – lack of ability to stay focused and concentrate, I'm going to put unskilled work. Also only no more than – not work that's in direct contact with the public constantly, so no more than occasional interaction, public. And I think those 2 things will probably take care of the situation. The focus we'll limit down to unskilled. It might be that I would do an SVP of three or if it was transferable, if it's something she already knows how to do, but otherwise, unskilled.

(Tr. 82).

The vocational expert indicated that this hypothetical would preclude the plaintiff's past work, but not other work such as an assembler, a sweeper/cleaner, or a hand packer (Tr. 83). The ALJ then asked about the limitations of not being able to stand constantly (Tr. 83-84). The vocational expert indicated that this would eliminate medium work but would leave light work, such as a routing clerk, a bench assembler, or final inspector (Tr. 84-85). The vocational expert cut the number of available jobs in half to make sure they had a sit/stand option (Tr. 85).

In response to questions from the plaintiff's attorney, the vocational expert indicated that there would be "no work" for an individual who had the following limitations:

> [M]arked restriction in activities of daily living, marked difficulties in maintaining social functioning, marked difficulties maintaining concentration, persistence, or pace. And if the claimant had an anxiety disorder with an inability to function independently outside one's home; could not meet competitive standards in several areas as far as remembering work-like procedures; understand, remember, and carry out short, simple instructions; maintain attention for 2-hour segment; maintain regular attendance and punctuality with the normal customary tolerances; could not deal with – unable to meet competitive standards – as far as dealing with normal work stress; and finally would miss four or more days a month due to the impairments or treatments.

(Tr. 87-88).

16

## **ANALYSIS**

The plaintiff alleges disability commencing May 29, 2009, at which time she was 43 years old. She was 46 years old on the date when the ALJ issued her decision. She has past relevant work as a billing clerk and as a coding clerk. The ALJ determined that the plaintiff had the RFC to perform a reduced range of light work. The plaintiff argues that the ALJ erred by improperly giving little weight to the medical opinion of Dr. Galvarino and further argues that the new evidence submitted to the Appeals Council, which included a statement from Dr. Bloodworth, requires remand as it might have affected the ALJ's decision.

### *Treating Physician*

The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 404.1527(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling

("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927].  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

The plaintiff raises several specific contentions relating to the ALJ's failure to giving controlling weight to the opinion of Dr. Galvarino: *(1)* Dr. Galvarino provided an opinion that, if believed, would support a finding of disability (doc. 15 at 19); *(2)* the ALJ did not give logically or legally sufficient reasons for discounting Dr. Galvarino's opinion (*id.* at 21); *(3)* the opinions from the non-examining, State agency physicians are not entitled to more weight than the opinion of Dr. Galvarino because they were made without the benefit of Dr. Galvarino's opinion and took place before Dr. Galvarino completed his Mental Impairment Questionnaire on October 19, 2011 (*id.*); *(4)* Dr. Galvarino's opinion is not actually inconsistent with the records from Internal Medicine Associates (*id.* at 23); *(5)* the plaintiff's daily activities do not support discounting Dr. Galvarino's opinion (*id.* at 25); *(6)* there is no evidence that Dr. Galvarino's opinion was based on sympathy (*id.* at 27); and *(7)* general statements of inconsistency are insufficient to support discounting Dr. Galvarino's opinion  (*id.*).

The Commissioner contends: *(1)* the ALJ properly considered Dr. Galvarino's opinion, which was inconsistent with the opinions of Drs. Harkness and Horn and with the plaintiff's daily activities  (doc. 16 at 11–15); *(2)* Dr. Bloodworth's treatment notes were

18

inconsistent with Dr. Galvarino's opinion *(id.* at 13); and *(3)* the ALJ did not err by commenting that Dr. Galvarino's opinion seemed sympathetic to the plaintiff *(id.* at 15).

The Mental Impairment Questionnaire completed by Dr. Galvarino (Tr. 398–404) indicates that the plaintiff had a current GAF of 62 (Tr. 398); had a highest GAF in the previous year of 66 (Tr. 398); was taking five medications prescribed by him (Tr. 398); had PTSD, severe depression, impulsive and erratic behavior, and could not get along with people (Tr. 398); and had a poor prognosis. Dr. Galvarino checked 21 boxes on the patient's signs and symptoms portion of the Mental Impairment Questionnaire (Tr. 399), indicated that the plaintiff did not meet 15 of the 16 competitive standards with respect to mental abilities and aptitudes needed to do unskilled work (Tr. 400), did not meet any of the four standards with respect to mental abilities and aptitudes for doing semi-skilled or skilled work (Tr. 401), did not meet three of the five standards with respect to mental abilities and aptitudes for doing particular types of jobs (Tr. 401), had marked functional limitations with respect to daily living, social functioning, and concentration (Tr. 402), would have three episodes of decompensation in a 12-month period (Tr. 402), and could not perform sedentary work with a sit-stand option in an eight-hour workday in a 40-hour work week (Tr. 404).

The Commissioner first contends that the ALJ correctly accorded "little weight" to Dr. Galvarino's opinion because it conflicted with the other medical evidence with respect to the plaintiff's work-related limitations (doc. 16 at 11). The Commissioner cites *Smith v. Schweiker*, 795 F.2d 343, 345–46 (4th Cir. 1986), which allows the ALJ to discount a treating physician's opinion where the testimony of a non-examining physician is consistent with the record or if the medical expert testimony from the examining or treating physician "goes both ways[.]"

As noted by the ALJ (Tr. 23), the State agency mental RFC consultants' opinions contradicted Dr. Galvarino's opinion. Dr. Harkness, on January 29, 2010, found

that the plaintiff was moderately limited in only three of twenty categories (Tr. 310–11) and was "capable of short, simple repetitive work away from the general public" and could "adapt to the basic demands of a work environment" (Tr. 312). Also, on December 14, 2010, Dr. Horn found that the plaintiff could remember location and work-like procedures, understand simple instructions and work-hour requirements, could make simple work-related decisions, had the capacity to ask simple instructions and of request assistance for peers or supervisors, and was "capable of interacting with the public" (Tr. 364). The ALJ found that these opinions were consistent with the record evidence and gave them "great weight" (Tr. 23).

The plaintiff contends that the findings of the consultative physicians were based on an incomplete record because they were made without the benefit of Dr. Galvarino's critical opinion (doc. 15 at 21). Dr. Galvarino completed the Mental Impairment Questionnaire (Tr. 398) on October 19, 2011, approximately 21 months after Dr. Harkness' opinion and approximately ten months after Dr. Horn rendered his opinion. The plaintiff cites Social Security cases from outside this Circuit and ERISA cases from within this Circuit discounting administrative fact-finding based on an incomplete record (doc. 15 at 22 n. 7). However, as argued by the Commissioner, an ALJ may rely on a medical source opinion that did not have access to the entire medical record, so long as the ALJ accounts for any subsequent evidence, and substantial evidence supports the ALJ's decision (doc. 16 at 12 (citing *Thacker v. Astrue*, No. 11-246, 2011 WL 7154218 (W.D.N.C. Nov. 28, 2011), *adopted by* 2012 WL 380052 (W.D.N.C. Feb. 6, 2012))).

In *Thacker*, the Magistrate Judge concluded that a physician's finding of RFC was not binding on the Commissioner:

> Neither the Commissioner's regulations nor applicable case law require the ALJ to obtain medical expert testimony or evaluation concerning a plaintiff's RFC. The RFC finding is an administrative determination reserved to the ALJ concerning

the most a plaintiff can do despite her impairments. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). As explained in *Evangelista v. Sec'y of Health and Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987), "the basic idea which the claimant hawks – the notion that there must always be some super-evaluator, a single physician who gives the fact finder an overview of the entire case – is unsupported by the statutory scheme, or by the case law, or by common sense, for that matter." Rather, the ALJ is entitled "to piece together the relevant medical facts from the findings and opinions of multiple physicians." *Id.* Here, the ALJ relied upon the state agency assessment that existed in the record (Tr. 741), as well as Plaintiff's testimony and underlying treatment notes, to determine that she could perform light work. (Tr. 17–20). The fact that the state agency physician did not have access to the entire evidentiary record-because the record was incomplete a the time of the assessment-is inconsequential as the ALJ considered the entire evidentiary record and substantial evidence supports his determination. (Tr. 18–20). Moreover, there is nothing in the additional medical evidence subsequently submitted by Plaintiff to indicate that she possessed limitations beyond light work.

*Thacker*, 2011 WL 7154218 at *6.

Here, the ALJ considered the entire record, and substantial evidence supports her determination to discount the opinion of Dr. Galvarino. The medical records, including progress notes from Dr. Galvarino, fail to show the extreme limitations found by Dr. Galvarino in his opinion, and the medical record further shows that the plaintiff's depression has been stable on medication. As the ALJ explained, the record evidence was more consistent with the opinions of Drs. Harkness and Horn (Tr. 23). Thus, the ALJ permissibly assigned them greater weight. *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted). Also, Fourth Circuit cases "clearly contemplate [that treating physician] opinions may be rejected in particular cases in

deference to conflicting opinions of non-treating physicians." *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986).

The ALJ further found that Dr. Bloodworth's treatment notes were inconsistent with Dr. Galvarino's opinion (Tr. 23). Specifically, Dr. Bloodworth repeatedly stated that the plaintiff had a "normal mood and appropriate affect" or was "stable" on her medication (Tr. 202, 210, 314, 323, 372). The plaintiff argues that references to "being stable" are not contradictory to Dr. Galvarino's opinion, and thus it was improper for the ALJ to consider such (doc. 15 at 23-25). However, as argued by the Commissioner, this was one of many factors in the ALJ's analysis of Dr. Galvarino's opinion, and the ALJ described Dr. Bloodworth's notations in context, noting, for example, that in May 2010 the plaintiff reported feeling well and wanted to go off of her depression medication (Tr. 18; *see* Tr. 314).

The ALJ further found that the plaintiff's activities of daily living were inconsistent with Dr. Galvarino's opinion (Tr. 22-23). Specifically, the ALJ noted that the plaintiff did light housework, prepared simple meals, loaded the dishwasher, went to Wal-Mart, went to her son's football games, watched television, took care of pets, volunteered at her children's sporting events, spent time with family, and shopped on the computer (Tr. 20). While the plaintiff is correct that there is no requirement that a claimant be bedridden in order to be unable to perform substantial gainful activity, a claimant's daily activities are an appropriate consideration for an ALJ. Here, the undersigned agrees with the Commissioner that the plaintiff's activities tend to show that she was capable of more than the extreme limitations of which Dr. Galvarino opined, and thus it was not error for the ALJ to cite the plaintiff's daily activities as one of several reasons to discount Dr. Galvarino's opinion.

In giving Dr. Galvarino's opinion little weight, the ALJ also noted that the opinion was "overly sympathetic to the claimant and not consistent with the other substantial

evidence of record" (Tr. 23). The plaintiff argues that under *Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1996), an ALJ may not assume that doctors routinely lie to help their patients collect disability insurance benefits (doc. 15 at 27). However, as noted by the Commissioner, *Lester* concerns an ALJ's rejection of an examining psychologist's opinion because it was obtained for the purpose of litigation. The Ninth Circuit Court of Appeals noted: "The purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them. An examining doctor's findings are entitled to no less weight when the examination is procured by the claimant than when it is obtained by the Commissioner." *Lester*, 81 F.3d at 832. Here, as argued by the Commissioner, the ALJ only noted that Dr. Galvarino's opinion was overly sympathetic in light of the inconsistencies with the record (Tr. 23). However, even assuming the ALJ erred in making this statement, such error was at most harmless as the ALJ gave several valid reasons for discounting Dr. Galvarino's opinion. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

The ALJ gave specific reasons for the weight given to Dr. Galvarino's opinion, and those reasons are supported by substantial evidence. Accordingly, this allegation of error is without merit.

### New Evidence

Following the ALJ's decision on January 6, 2012, the plaintiff submitted Dr. Bloodworth's June 2012 opinion to the Appeals Council. The Appeals Council considered the opinion and found that it did not provide a basis for changing the ALJ's decision (Tr. 2), and Dr. Bloodworth's opinion was incorporated into the record (Tr. 5; *see* Tr. 406). As set forth in detail above, Dr. Bloodworth opined that the plaintiff's mental impairments "most probably" precluded an eight-hour workday. He further stated that the plaintiff had

"significant" neuropathy, which limited her walking and standing, and difficulty with her blood sugar, which was exacerbated by her anxiety (Tr. 406).

The plaintiff contends that the decision of the Court of Appeals for the Fourth Circuit in *Meyer v. Astrue*, 662 F.3d 700 (4th Cir. 2011), "on balance" requires that Social Security cases be remanded if there is a real likelihood that the new evidence submitted to the Appeals Council might have affected the fact-finder's decision (doc. 15 at 28). The Commissioner, however, contends that *Meyer* does not require a remand in the case at bar because the record provides an adequate explanation of the ALJ's decision and the ALJ, in any event, noted the plaintiff's significant sensory neuropathy and accounted for her emotional difficulties (doc. 16 at 17–18). The Commissioner also notes that Dr. Bloodworth's opinion that the plaintiff could not work is an issue reserved to the Commissioner (*id.* at 18). In her reply brief, the plaintiff contends that Dr. Bloodworth's report is consistent with Dr. Galvarino's findings, shows the work-related impairments resulting from the plaintiff's diabetes and her inability to control her blood sugar, and the opinions are inconsistent with the decision of the ALJ (doc. 17 at 11–12).

The ALJ in *Meyer* issued a decision denying benefits and noted that Meyer failed to provide an opinion from his treating physician. 662 F.3d at 702. When Meyer requested review of his claim by the Appeals Council, he submitted a letter from a physician detailing the injuries (from a fall) and noting significant restrictions on Meyer's activity. The Appeals Council summarily denied review but made the letter part of the administrative record. The Magistrate Judge in *Meyer* recommended that the Commissioner's decision be affirmed because the doctor who authored the report was not a treating physician and thus the report should be accorded only minimal weight, and the district court adopted the Report and Recommendation. *Id.* at 704. The Court of Appeals however determined that the doctor was in fact a treating physician, the report submitted to the Appeals Council was the only report in the record from a treating physician, and the report constituted new and

24

material evidence. *Id*. at 705.  The court remanded for additional fact finding to reconcile conflicts between the newly submitted evidence and the evidence the ALJ had considered. *Id.* at 707.  The court stated that when the Appeals Council receives additional evidence and denies review, the issue for the court is whether the ALJ's decision is supported by substantial evidence. *Id*.

In the case at bar, substantial evidence supports the ALJ's findings. First, the ALJ accounted for each of the impairments mentioned in Dr. Bloodworth's report.  Dr. Bloodworth noted that the plaintiff had "significant sensory neuropathy" (Tr. 406).  Similarly, the ALJ found that the plaintiff's neuropathy was a severe impairment and limited the plaintiff to light work with no constant standing and the ability to change positions (Tr. 17, 21).  The ALJ also accounted for the plaintiff's emotional difficulties, finding her anxiety and depression were severe and limiting her to "unskilled work with no more than occasional interaction with the public" (Tr. 17, 21).

Second, as argued by the Commissioner with respect to Dr. Bloodworth's finding that the plaintiff cannot attend work on an eight-hour basis, this is equivalent to a statement that the plaintiff is disabled and thus merits no weight as it is an issue reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(d) ("Opinions on some issues ... are not medical opinions, ... but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case.")*;* SSR 96-5p, 1996 WL 374183, at *5 ("Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is "disabled" or "unable to work," or make similar statements of opinions. In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work.  Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner.  Such opinions on these

issues must not be disregarded. However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance.").

Based upon the foregoing, the undersigned finds that, considering Dr. Bloodworth's June 2012 opinion along with the other evidence of record, substantial evidence supports the ALJ's decision.

### CONCLUSION AND RECOMMENDATION

The Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

May 14, 2014
Greenville, South Carolina

26